[Civ. No. 25155.  Second Dist., Div. Three.  Dec. 28, 1961.]

MARGARET BOYD, Plaintiff and Appellant, v. SIMON M. LAZARUS, Defendant and Respondent.

Milton Zerin for Plaintiff and Appellant.

Margolis & McTernan and Ben Margolis for Defendant and Respondent.

FORD, J.—The plaintiff, a licensed real estate broker, sought to recover a commission for which provision had been made in a lease executed by the defendant Lazarus as lessor and by Ronald Priestley as lessee.  She relied on no other

agreement. From a judgment in favor of the defendant she has appealed.

The lease was executed on March 24, 1958, and was for a period of 20 years commencing on November 1, 1958. The lessor agreed to construct upon the demised premises a building suitable for use as an ice palace and auditorium; if the building costs should exceed $100,000, the total amount of such excess costs was to be paid by the lessee.

Article IV of the lease was as follows: "It is expressly understood and agreed that this lease shall be void and of no effect in the event that Lessor is unable to obtain upon reasonably satisfactory terms financing for the entire portion of building costs to be borne by him as defined and provided in this lease. In that event all monies paid to or deposited with Lessor by Lessee shall be returned to Lessee and neither party shall have any further obligation to each other or cause of action against the other. It is understood and agreed that 'reasonably satisfactory terms' as provided in this Article IV shall include, but not be limited to, a loan for a term of not less than ten (10) nor more than twenty (20) years with annual interest at six percent (6%) and initial charges, including brokerage, not to exceed one (1%) percent. It is further understood and agreed that if Lessor is unable to obtain said financing upon reasonably satisfactory terms, Lessee shall have a reasonable opportunity to obtain said financing upon reasonably satisfactory terms as defined in this Article IV."

Article V of the lease was in part as follows: "Lessor will pay, and will hold Lessee harmless therefrom, the standard Real Estate Board commission . . . to wit: a total commission of $9,000.00. *Lessor will pay 50 percent of said commission to the brokers when construction work on the building described herein is actually commenced and will pay 50 percent of said commission upon receipt from Lessee of the payment of $10,000.00 provided in Article III (6)*[1] *against Lessee's payment of $24,000.00 provided above.* Lessee will

---

[1]The reference was apparently intended to be to article III (b) which was in part as follows: "(b) Notwithstanding any other provision in this lease Lessee will pay Lessor the sum of Twenty-Four Thousand Dollars ($24,000.00) as guaranteed rent in advance for twelve (12) months of the term of this lease . . . in installments as follows: Nine Thousand Dollars ($9,000.00) upon the date of the signing of this lease. Five Thousand Dollars ($5,000.00) at the time that construction is actually commenced on the demised premises. Ten Thousand Dollars ($10,000.00) to be paid at least sixty (60) days before occupancy of the premises by Lessee."

pay . . . 40 percent of said commission to White Oak Realty, Marge Boyd, . . . .'' (Emphasis added.)

Thereafter the lease was assigned to a corporation of which Mr. Priestley was president and a major stockholder. On July 7, 1958, the lease was modified with respect to certain matters. It was provided that in the event the building costs should exceed $100,000, Mr. Lazarus, the lessor, would advance the amount of such excess costs in the form of a loan to the corporation which was to be repaid as provided in that supplemental agreement. Changes were also made with respect to the payment of rental.

Construction of the proposed building was never undertaken. On August 29, 1958, an agreement and release was executed by Mr. Lazarus and by Mr. Priestley, individually and on behalf of the corporation. One paragraph therein was as follows: ''Certain differences have arisen between the parties with respect to the performance and execution of the agreements of March 24 and July 7, and it is the desire of all parties hereto, finally and forever, to terminate each of said agreements and to provide terms upon which each will release the other from all liability thereunder.'' It was acknowledged that pursuant to the provisions of article III (b) of the lease, the lessee had paid the sum of $9,000 to the lessor. Under the agreement, the lessor undertook to pay to the corporation the sum of $6,500. Priestley and the corporation were to pay the architect's fees and charges and were to acquire title to, and the right to use, the plans and specifications. Each party was released from all liability under or arising from the lease as modified. The plaintiff filed her action on October 21, 1958.

Some of the findings of fact of the trial court were: There was no agreement for the payment of a commission by the defendant to the plaintiff except that contained in the lease; the plaintiff at all times acted as broker for Ronald Priestley; Priestley paid a deposit of $9,000 to the defendant; the lowest bid received for the construction of the building was in the amount of $127,000; the defendant attempted to obtain the required financing and applied therefor to certain banks but ''was not able to obtain any financing or commitments whatsoever, for the reason amongst others, that the institutions would not loan on a one purpose building''; the lessor could not obtain the ''agreed financing''; the construction of the building was never started and the lessor did not receive the sum of $10,000 for which provision was made in article III (6) [III (b)] of the lease.

■ This court cannot reweigh the evidence but will view it, including the inferences which find reasonable support therein, in the light most favorable to the respondent. (*W. B. Camp & Sons* v. *Turner Steel Erection Co.*, 141 Cal.App.2d 569, 571 [297 P.2d 125].) Accordingly, the evidence which supports the determination of the trial court will be stated. In addition, reference will be made to certain evidence upon which the plaintiff places reliance on this appeal.

Harold Blair, a real estate salesman, testified that he represented Mr. Lazarus, the lessor, and that the plaintiff, Mrs. Boyd, represented the lessee in the transaction.

Mr. Lazarus testified that the lowest bid for the construction of the building as planned was approximately $127,000. He discussed the additional cost of $27,000 with Mr. Priestley. Mr. Priestley said that he could not raise the money and asked Mr. Lazarus to do so; Mr. Lazarus agreed that he would if the terms of the lease were changed so as to compensate him for the additional investment. As a result of the conversations between the two men, the supplemental agreement of July 7, 1958, was made. By that time Mr. Lazarus did not have from any source a loan of at least $100,000 for a period of 10 years at the interest rate of 6 per cent with 1 per cent charges or on any terms reasonably approximating such terms. He had no loan at all. Upon his application to the Bank of Encino, a loan was refused. Before August 1, 1958, Mr. Lazarus had not agreed with Mr. Priestley that there should be a mutual release. On August 4, 1958, Mr. Lazarus had no loan commitment for $100,000 on any terms from any source.[2] Sometime after August 6 he heard from the Bank of Encino that his further application, being for a loan of $100,000 for seven years, had been declined. He made an application for a loan to the First Western Bank on August 2, 3 or 4, and "maybe" four or five or six days later—later "than August the 4th or August the 7th"—he heard that such a loan had been refused. Mr. Priestley never offered to obtain financing for him. On August 4, 1958, and on August 6, 1958, Mr. Lazarus thought

[2] Under date of August 4, 1958, Mr. Lazarus' attorney wrote to Mr. Priestley's attorney in part as follows: "Specifically, Mr. Lazarus advises me that he has obtained the financing specified in the lease. . . ." The proposed form of release which had been submitted on behalf of Mr. Priestley on or about August 1, 1958, was returned to the latter's attorney. In a letter to Mr. Priestley dated August 6, 1958, Mr. Lazarus' attorney stated in part: "Mr. Lazarus has obtained the necessary financing upon satisfactory terms and has been ready, able and willing to commence construction work on the premises at once."

that he would obtain the money "either from the Western Bank or from the Bank of Encino." Mr. Lazarus further testified that he never received $10,000 from either Mr. Priestley or the corporation to which he had assigned the lease.

Over the plaintiff's objection limited to the ground of its relevancy, a letter from a vice-president of the Bank of America was received in evidence; therein it was stated in substance that in 1957 Mr. Lazarus inquired with respect to whether that bank would finance an ice-skating rink on his property and he was informed that it was not the bank's policy "to grant loans on property improved by a building to be used for this purpose."

A portion of the deposition of Mr. Lazarus was read into evidence on behalf of the plaintiff. Therein Mr. Lazarus testified as follows: "Q. Did you ever tell Mr. Priestley you wouldn't go ahead with the deal unless he raised the guaranteed rental to $2,000 minimum? A. I did, maybe. I don't know. I probably did, but whether I did or not I don't know at this particular time. I said, 'If you want the deal, you have to pay the $2,000 extra,' and I wouldn't be a bit surprised that I did tell him that."

Prior to the time that Mr. Lazarus testified on his own behalf at the trial, Mr. Priestley, when called as a witness by the plaintiff, testified as to the efforts of Mr. Lazarus in the latter part of July or the first part of August to get Mr. Priestley to modify the terms of the lease so as to provide a more favorable financial return for Mr. Lazarus. Mr. Priestley told him that it was impossible for him to accept the proposed revision. Thereafter, Mr. Priestley contacted his attorney and he and Mr. Lazarus entered into the release.[3] Mr. Priestley further testified: "Q. On August 4th, his attorney wrote you he was prepared to go ahead under any circumstances? A. Exactly. Q. You declined that? A. Yes. Q. He at that time offered to go ahead on the existing agreement? A. Yes, at that time. Q. He repeated his offer on August 6th that he was willing to go ahead on the existing agreement? A. Yes, at that time. Q. He repeated his offer on August 6th that he was willing to go ahead on the existing agreement? A. The other stockholders and I agreed we could not continue to do business with Mr. Lazarus because of his attitude. . . . We didn't want to be with him for 20 years. We wouldn't sleep nights."

---

[3] Under date of August 1, 1958, Mr. Priestley's attorney sent a form of release to Mr. Lazarus' attorney.

The law applicable to an agreement of the nature herein involved for the payment of a commission to a broker was discussed by this court in *Lawrence Block Co.* v. *Palston*, 123 Cal.App.2d 300 [266 P.2d 856]. ▮ It was therein said at pages 306-307: ''Where the only agreement to pay a broker a commission is contained in the contract between his principal and the customer, the broker's right to compensation is dependent upon performance of that contract. If the customer refuses to perform, or if the contract is canceled or rescinded, the broker cannot recover. In such cases the broker, not having the protection of the ordinary broker's contract for compensation for service to be performed, must stand or fall on the contract actually entered into; and if he has seen fit to allow payment of his compensation to be dependent upon the performance of a contract made between parties other than himself, he cannot complain if, through the non-performance of that contract, his own contingent rights be lost. [Citations.]'' (See also *Ira Garson Realty Co.* v. *Brown*, 180 Cal.App.2d 615, 624-626 [4 Cal.Rptr. 734]; *K. Lundeen Corp.* v. *Barlow*, 120 Cal.App. 391, 394-395 [7 P.2d 1102].)

▮ Half of the commission was to be paid when construction of the proposed building was actually commenced. The other half was to be paid when the lessor received a particular payment of $10,000. Accordingly, performance was not due as to either portion of the commission except upon the happening of a particular event. (See *Cochran* v. *Ellsworth*, 126 Cal. App.2d 429, 439-440 [272 P.2d 904]; *Amies* v. *Wesnofske*, 255 N.Y. 156 [174 N.E. 436, 437-438, 73 A.L.R. 918].) But it is manifest that the parties did not contemplate that the construction of the building would commence before the financing could be obtained pursuant to the provisions of article III (b). The trial court was justified in determining that it was not possible for Mr. Lazarus to obtain such financing because of the one-purpose nature of the proposed structure. Under the provisions of article IV, the lease was to be ''void and of no effect'' in that event. In such event the lessor and lessee were free to treat the lease as terminated. As said in *Houghton* v. *Kuehnrich*, 46 Cal.App.469 [189 P. 457], at page 474: ''The provision of said agreement for the payment of a compensation to plaintiff was an integral part of it, and when the contract was canceled and terminated all its provisions were canceled and terminated, including the provision for plaintiff's benefit.''

It is true that the record supports an inference that Mr. Priestley and the corporation to which the lease had been assigned, in seeking to have the document of August 29, 1958, executed, were primarily motivated by their desire to avoid further association with Mr. Lazarus because of his obnoxious attempts to change the terms of the lease and thereby to further his own financial interests. However, be that as it may, the trial court was justified in reaching the conclusion that such conduct on the part of Mr. Lazarus was unrelated to the subject of the procurement of the required financing. Since that financing could not be obtained, the conditions precedent to the payment of the installments of the commission could not occur, regardless of the criticized conduct of Mr. Lazarus. Consequently, the reasoning of *Coulter* v. *Howard*, 203 Cal. 17, 23 [262 P. 751], upon which the plaintiff relies, cannot aid her. As stated with respect to a similar problem in *Ira Garson Realty Co.* v. *Brown, supra,* 180 Cal. App.2d 615, at pages 628-629: "Appellant's second cause of action seeks recovery on the theory that it is a third party beneficiary of the provision for payment of the $7,500 commission contained in the escrow instructions. The latter were signed by Stahl and defendants; plaintiff was not a party thereto. A line of authority following *Dowds* v. *Armstrong,* 17 Cal.App.2d 485 [62 P.2d 411, 63 P.2d 1114]; *K. Lundeen Corp.* v. *Barlow,* 120 Cal.App. 391 [7 P.2d 1102]; *Houghton* v. *Kuehnrich,* 46 Cal.App. 469 [189 P. 457], and *Lawrence Block Co.* v. *Palston,* 123 Cal.App.2d 300 [266 P.2d 856]; has established the rule applicable here, that if the broker chooses to rely for his commission on an agreement between other persons, rather than enter into a contract of his own with the seller, then his right to a commission becomes a contingent one dependent on consummation of the sale. In the case at bar when the terms of the only written agreement in existence between Stahl and defendants failed, plaintiff, upon noncompletion of the sale provided therein, lost its right to any commission. Inasmuch as no *direct* right of plaintiff to any commission existed after Stahl withdrew and cancelled the escrow, we find no merit in its attempt to assert the same right under the agreement in a lesser capacity as a third party beneficiary."

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.