[Civ. No. 30216. Second Dist., Div. Four. Apr. 20, 1967.]

WILSHIRE REALTY COMPANY, Plaintiff and Appellant, v. KRY CORPORATION, Defendant and Respondent.

Carl J. Mooslin for Plaintiff and Appellant.

George E. Atkinson, Jr., for Defendant and Respondent.

FOX, J.*—This is an action to recover a brokerage commission. Judgment was rendered for defendant. Plaintiff has appealed.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

The complaint contains three causes of action. The first cause of action sought to recover from the defendant, Kry Corporation, a broker's commission of $5,000 growing out of a purported authorization to plaintiff by the president of said corporation to sell a car wash business it had, and an escrow for the sale of this business by the Kry Corporation to Russell W. Willes which, however, was cancelled without the transaction being accomplished.

The second cause of action is not involved in this appeal.[1]

The third cause of action is based upon an alleged conspiracy between the Kry Corporation and Russell W. Willes to cancel the escrow these parties had for the purchase and sale of this car wash business in order to cheat and defraud plaintiff out of its earned commission of $5,000, and that in furtherance of such conspiracy the parties later opened another escrow through which Willes came into possession of the premises and business as a lessee of the Kry Corporation.

Early in May 1962, John H. McManus, a licensed business opportunity salesman employed by plaintiff, received a telephone call from Thomas R. Young who was president of the Kry Corporation that owned the La Mirada Car Wash. As a result of this telephone conversation, McManus went to see Young regarding the sale of the car wash and took certain essential information given him by Young on an ''Authorization to Sell'' blank, returned to his office in Los Angeles, typed up the information on another Authorization to Sell blank, mailed it back to Young who revised some of the figures and added some notations in handwriting. Young discussed these items with McManus over the phone but did not sign the document. At the trial, however, a handwritten Authorization to Sell the car wash in controversy, signed by McManus and purportedly signed by Thomas R. Young, was presented by plaintiff and received in evidence. Young denied ever having seen this particular document (plaintiff's exhibit 1) and testified he did not sign it.[2]

A listing was typed up in plaintiff's office and put in a book among other businesses for sale. This listing, along with

---

[1] Plaintiff recovered judgment against defendant Russell W. Willes on the second cause of action for $8,500 plus attorney's fees, interest and costs. Willes appealed but later abandoned his appeal. An order was made dismissing said appeal.

[2] A number of checks signed by Young about this time were received in evidence for the purpose of comparing his signature on these checks with ''Thomas R. Young'' on plaintiff's exhibit 1.

others, was made available to Russell W. Willes about August 6, 1962. He went out and looked at the property. On August 13 Willes made an offer (plaintiff's exhibit 3). It was not satisfactory to Young and his associates. A counter proposition was made. Finally, upon the basis of the representations that had been made, the parties apparently came to an agreement on the deal and entered into an escrow at the Gramercy Escrow Company in Los Angeles on August 24, 1962, for the purpose of effectuating the transaction. On September 10th the board of directors of the Kry Corporation passed a resolution approving the proposed sale to Willes.

On September 20, 1962, Willes directed a letter to the Gramercy Escrow Company terminating the escrow between him and the Kry Corporation for the purchase of the La Mirada Car Wash. This letter reads in pertinent part: "In regard to the above referenced escrow, there is a difference between the bargained sale price and the now sale price which would have to be assumed by the undersigned of approximately $7,000.00. This approximate $7,000.00 results from a bargained pay-off of approximately $21,000.00 on a lease contract to S. F. C. Financial Corp., whereas, the actual pay-off on the lease contract is approximately $28,000.00.

"This substantial difference is irreconcileable [sic], consequently, negotiations between the undersigned and the Kry Corp. for the purchase of the La Mirada Car Wash have been discontinued." On September 24 the Kry Corporation wrote a letter to the escrow company regarding this matter, which in pertinent part reads: "In regards to the escrow of Russell W. Willes and the Kry Corporation there seems to have been a difference in the lease contract to S. F. C.

"We received a letter from Mr. Willes stating that the difference is irreconcileable [sic] consequently between the two parties negotiations between the two the Kry Corporation and Russell W. Willes as for the purchase of the la Mirada [sic] Car Wash has been discontinued. You are requested to send me any statements, papers or copies of the lease as soon as possible."

At the escrow office in explanation of why the escrow was being terminated, Willes stated: "The figures had been misrepresented to him." At the trial in response to the question: "Why did you terminate it [the escrow]?", Mr. Willes testified: "Because there was a substantial difference between the reputed pay-off, represented pay-off on machinery, and that which proved to be the accurate pay-off."

Paragraph 8 of the escrow instructions contained this provision: "Seller agrees to pay brokerage commission to Wilshire Realty Co. for services rendered and completed in the amount as per separate instruction from seller, and the parties hereto do authorize and instruct the Gramercy Escrow Co. to pay said commission or any portion thereof forthwith out of the funds deposited in escrow because same is not contingent upon any act, performance, condition or instruction herein." On the same date as the escrow instructions were executed, the Kry Corporation signed this additional instruction: "The undersigned seller does agree to a brokerage commission to Wilshire Realty Co. in the sum of $5,000.00 as follows: $5,000.00 cash as per terms of original escrow instructions. Total commission."

A few days after the above escrow was terminated Willes came back to the car wash premises and suggested that they try to work out a deal on some kind of a lease arrangement. This suggestion was pursued, resulting in an escrow being opened in Anaheim. A deal was consummated on lease and sublease bases by which Willes came into possession and became the operator of the car wash. On October 9, 1962, Willes wrote a letter to Wilshire Realty Company which read in pertinent part: "I previously mentioned to you by phone that I had made an offer to the Kry Corp. to lease the La Mirada Car Wash.

"This is to advise you that I have consummated a lease, and as the lessee am in possession of the business."

The court found, *inter alia*: "That it is not true that Thomas R. Young executed an authorization to sell said car wash as alleged in the first, second and third counts in plaintiff's complaint.

"That under date of August 13, 1962 defendant Willes, through plaintiff, submitted a written offer to defendant Kry Corporation for the purchase of said car wash, which offer was not accepted; thereafter on August 24, 1962 written escrow instructions were executed by defendant Willes and Thomas R. Young as president of Kry Corporation, at Gramercy Escrow Company, Los Angeles, in the presence of one or more representatives of plaintiff; it is true that the purchase terms contained in said escrow were substantially different than the rejected prior offer.

"That by a separate document, also dated August 24, 1962 and signed by Thomas R. Young as president of Kry Corporation, it was agreed that the seller would pay plaintiff a

broker's commission of five thousand dollars from the escrow funds.

"That it is true that on September 10, 1962 the board of directors of Kry Corporation at a special meeting authorized the sale of the La Mirada Car Wash to defendant Willes.

"That it is true that under date of September 20, 1962 defendant Willes notified plaintiff, the escrow holder and Kry Corporation that there was a difference between the sum represented to be due and the sum actually due under a contract to be assumed by the buyer, and the escrow was cancelled; that under date of September 24, 1962 Kry Corporation notified the escrow holder that the escrow was cancelled; that no sum was paid from said escrow to plaintiff or Kry Corporation; that Kry Corporation did not retain any consideration received.

"That it is true that thereafter defendant Willes submitted to Kry Corporation, in October, 1962, but not through plaintiff, an offer to lease said car wash; that said offer resulted in two leases between defendants Willes and Kry Corporation; that said transactions were completed through an escrow at Security Escrow Company, Anaheim, California; . . . that it is not true, between plaintiff and defendant Kry Corporation, that said lease or leases provided for the purchase of fixtures or equipment from Kry Corporation.

"That the allegations of paragraphs II, III and IV of the third count in plaintiff's complaint are not true."[3]

At the outset plaintiff attacks the finding that Young did not execute the authorization to sell the car wash (plaintiff's exhibit 1) on the ground of insufficiency of the evidence. In making this attack plaintiff simply ignores the long established principle that an appellate court must accept as true all evidence that tends to support the challenged finding, resolve all conflicts in favor of the finding and indulge all reasonable inferences in support of it.

 With these principles in mind it is clear that the evidence amply supports the challenged finding. Young testified that he did not sign the document in question, that the name "Thomas R. Young" appearing thereon was not his signature. Additionally, a number of checks signed by Young about the date of exhibit 1 (Authorization to Sell) were received in evidence so that these admittedly genuine signatures might be compared with the writing of Thomas R. Young on exhibit 1.

---

[3]These paragraphs contain the allegations of fraud and conspiracy.

After making such comparison the trial judge, in his memorandum decision, pointed out that these bona fide signatures demonstrate differences "which are persuasive to a non-expert that the signature [on exhibit 1] is not genuine."

This leaves plaintiff, at this point, without any valid authorization to sell the car wash and therefore without any agreement on the part of the Kry Corporation to pay a commission.

We now go to finding VI, to the last portion of which plaintiff objects. That finding is based on paragraph 8 of the escrow instructions (exhibit 4) in which the Kry Corporation "agrees to pay brokerage commission to Wilshire Realty Co. for services rendered and completed *in the amount as per separate instruction from seller,* and the parties hereto do authorize and instruct the Gramercy Escrow Co. to pay said commission or any portion thereof forthwith *out of the funds deposited in escrow . . .*" (italics added), and exhibit 5, executed by Kry Corporation on the same date as the escrow instructions, and which reads: "The undersigned seller does agree to a brokerage commission to Wilshire Realty Co. in the sum of $5,000 as follows: $5,000 cash *as per terms of original instructions. . . .*" (Italics added.)

The particular portion of finding VI to which plaintiff objects read ". . . it was agreed that the seller would pay plaintiff a broker's commission of five thousand dollars *from the escrow fund.*" (Italics added.) It is the underscored language to which plaintiff objects.

What the court obviously did was to construe exhibits 4 and 5 together. In so doing we believe the court acted correctly. These two exhibits were executed on the same date and as a part of the same transaction. The documents on their face *clearly show* that they were intended to be taken together. The first one (the escrow instructions—exhibit 4) states that Kry Corporation agrees to pay a brokerage commission but does not state the specific amount; instead it says "in the amount as per separate instruction from seller." We must then look to exhibit 5 for the amount of the commission to be paid. Exhibit 5 says the amount of the commission is "$5,000 cash as per terms of original escrow instructions." This language required the court to look back to exhibit 4 to ascertain the terms of the original instruction re payment which provided that the escrow company "pay said commission . . . out of the funds deposited in escrow. . . ." These provisions clearly justified the trial court in finding that the

brokerage commission was payable "from the escrow funds."

We now come to the right of plaintiff to recover a brokerage commission based on the escrow instructions. The escrow instructions to Gramercy Escrow Company, when they were ratified by the board of directors of Kry Corporation, constituted a contract between the corporation and Willes for the benefit of the Wilshire Realty Company. The realty company did not execute the escrow instructions, therefore, it was not a party to the escrow instructions and the resulting contract. The realty company was a third party. Insofar as the payment of commissions was concerned, the contract between Kry Corporation and Willes was "made expressly for the benefit of" the realty company (Civ. Code, § 1559) and it "may be enforced" by it "at any time before the parties thereto [*i.e.*, Kry Corporation and Willes] rescind it." But they mutually cancelled or rescinded the escrow transaction before the realty company took any action. Plaintiff so alleges in paragraph XIII of its first cause of action in this language ". . . that defendants, between themselves, mutually cancelled said escrow agreement on or about September 24, 1962." This proposition finds specific evidentiary support in the testimony of defendant Willes while under cross-examination by Kry Corporation's attorney. The following question was asked: "Q. Was that first escrow not canceled mutually and agreeably by all parties? A. Yes, sir." The principle of mutual rescission or cancellation is implicit in the court's determination of the case, for in conclusion of law number III the court stated: "That the mutual cancellation of said contract terminated any right of plaintiff to the broker's commission provided therein." Apposite here is *K. Lundeen Corp.* v. *Barlow,* 120 Cal.App. 391 [7 P.2d 1102]. That case involved a situation analogous to the one at bench. There one of the parties to an escrow rescinded his agreement because of a misrepresentation made by the other party as to the term of the mortgage on the subject real property. The plaintiff real estate broker was denied a recovery of his commission because his only rights existed under the contract of the other two parties which was rescinded before any action was taken by the plaintiff to recover his commission. At page 394 the court quoted from *Stanton* v. *Carnahan,* 15 Cal. App. 527 [115 P. 339] :

" 'That part of the contract upon which the action is based was made expressly for the benefit of plaintiff, and under the

provisions of section 1559, Civil Code, they were entitled to enforce the same at any time before the parties thereto rescinded it. If the parties had rescinded, then, under the provisions of said section, no recovery could be had. . . .' "

The court then went on to explain the applicable rule where the broker, who is a third party beneficiary, has no separate contract of employment. The court stated (p. 395) : "Plaintiff cites a number of cases holding that a real estate broker employed to sell real property has earned his compensation when he has produced a purchaser able and willing to take the property on the terms proposed, or who has been accepted by his principal. In these cases it will be found that the broker's rights are saved to him under a contract existing between the broker and the party defendant. Here no such contract existed, and the contract under which plaintiff claims was terminated and extinguished before plaintiff attempted to enforce his alleged rights. (*Jennings* v. *Jordan,* 31 Cal.App. 335 [160 P. 576] ; *Brion* v. *Cahill,* 34 Cal.App. 258 [165 P. 704] ; *Stewart* v. *Bowie,* 43 Cal.App. 751 [185 P. 868] ; *Houghton* v. *Kuehnrich,* 46 Cal.App. 469 [189 P. 457].) In the case of *Lind* v. *Huene,* 205 Cal. 569, at page 571 [271 P. 1087, 1088], the court, after citing the above cases, says: 'and more recently in *Houghton* v. *Kuehnrich,* 46 Cal.App. 469 [189 P. 457], wherein it is said that when there is no separate enforceable contract of employment with the broker and the owner's promise to pay the broker a commission is found only in the contract entered into between the owner and the prospective purchaser, if the purchaser should fail to carry out his undertaking to purchase, the owner is released from his promise to pay the broker a commission. In such a case, if the wrongful abandonment of the contract is consented to, the whole contract falls, the provision relating to the agent's commission with the rest.' . . . In the case at bar there was no such separate agreement and the contract had been terminated prior to plaintiff's attempt to enforce it."

In the instant case plaintiff failed to establish the execution by defendant of the Authorization to Sell (exhibit 1), so it stands in the same position as the plaintiff in *Lundeen* and is not entitled to recover. (*Lawrence Block Co.* v. *Palston,* 123 Cal.App.2d 300, 306-307 [266 P.2d 856] ; *Mitchell* v. *Johnston,* 140 Cal.App.2d Supp. 982, 983-984 [298 P.2d 170] ; *Ira Garson Realty Co.* v. *Brown,* 180 Cal.App.2d 615, 624-625 [4 Cal.Rptr. 734] ; *Boyd* v. *Lazarus,* 198 Cal.App.2d 658, 663 [18 Cal.Rptr. 333].)

■ There is another reason why plaintiff cannot recover its brokerage commission. The escrow instructions, upon which the rights of plaintiff to a commission essentially depend, provide, as we have earlier pointed out, that such commission was payable "from escrow funds." It does not appear that any funds belonging or available to plaintiff ever existed in the escrow. Consequently, no recovery can be had by plaintiff since it neither pleaded nor proved the existence of such available funds. (*Martin* v. *Martin*, 5 Cal.App.2d 591 [43 P.2d 314].)

Plaintiff particularly attacks finding X wherein the court found the allegations of paragraphs II, III and IV of the third cause of action (the count charging fraud and conspiracy) are untrue. Counsel for plaintiff apparently feels that the trial court should have found, as a fact, that the defendants were guilty of fraud and conspiracy as charged in his third cause of action.

■ It was, of course, for the trial court to evaluate the credibility of the witnesses, and determine the weight that should be given to their testimony, and, also, to determine the inferences that reasonably could be drawn from established facts.

With these principles in mind, we quote some of the questions put to Willes on cross-examination touching the questions of fraud and conspiracy in the cancellation of the first escrow, and Willes' answers thereto.

"Q. . . . Did you or any members of the Kry Corporation have any conversation prior to or at the time of the cancellation of the first escrow that you were going to immediately turn around or soon thereafter turn around and enter into a new transaction? A. No, sir.

"Q. By MR. ATKINSON: Mr. Willes, at the time the first escrow was canceled, did you have any intention at that time to make another transaction with the Kry Corporation? A. No, sir.

"Q. By MR. ATKINSON: At the time of the cancellation of the first escrow, were you carrying on any other negotiations of any kind with Kry Corporation? A. No, sir.

"Q. At the time of the cancellation of the first escrow had there been any conversations of any kind between yourself and any of the officers of Kry Corporation relative to entering into any other transaction? A. No, sir.

"Q. at the time of the cancellation of the first escrow had there been any conversations between yourself and any

member of Kry Corporation relative to endeavoring to join together to deprive anybody of any commissions that might be due? A. No, sir.''

We also quote similar questions put to Young on direct examination and his answers thereto:

''Q. By Mr. ATKINSON: At the time the escrow was canceled, Mr. Young, did you or Kry Corporation or any of the members of Kry Corporation, insofar as you know, have any intention to have any further negotiations with Mr. Willes relative to his La Mirada Car Wash? A. No.

''Q. Did you as the president believe that the entire transaction was dead at that point? A. By all means.

''Q. Did you have any conversations of any kind prior to or at the time of the cancellation of the first escrow with Mr. Willes or anybody on his behalf that after the cancellation of the first escrow there would be any further negotiations of any kind relative to the La Mirada Car Wash? A. None.

''Q. Did you, following the cancellation of the first escrow, or anyone else on behalf of Kry Corporation, as far as you know, solicit any further negotiations with Mr. Willes? . . . A. It was completely dead then, to my knowledge.

''Q. Did you go to see Mr. Willes or anybody from Kry Corporation go to see Mr. Willes after the first escrow was canceled? A. No.''

In support of its theory of fraud and conspiracy as alleged in the third cause of action, plaintiff argues that there is merely ''a distinction without a difference'' between the two transactions for they accomplished ''identically the same purpose.'' On this point the testimony of both Young and Willes is pertinent. On cross-examination Young was asked the following question:

''Q. By Mr. MOOSLIN: Was there any difference between the second transaction and the first transaction? A. Quite a little bit.''

A little later Young was asked these questions:

''Q. Did Mr. Willes tell you why he didn't want to go through with the first escrow? A. He told everybody at the escrow office.

''. . . . . . . . . . . .

''Q. What did he say at the escrow office? A. That there was a difference between the interest compared to the price of the equipment in the amount of seven or eight thousand dollars, and it was more than he was quoted by McManus.''

Willes on direct examination was asked the following questions:

"Q. Was the second transaction the same as the first transaction? A. No, sir.

"Q. What was different? A. The first transaction was for a purchase of the property under which I would have had to obligate myself by my personal signature to assume the obligations that the Kry Corporation had for the machinery and the buildings, et cetera.

"The second transaction did not provide for my personal obligation to assume these liabilities. In addition, there was a compromise because of the difference in the figures between the first price quoted and as the price turned out to be."[4]

The court's acceptance of the quoted testimony is sufficient to support finding X.

Finally, under no stretch of legal theory, can it be said that the evidence established, as a matter of law, that the defendants were guilty of fraud and conspiracy in terminating the first escrow and the working out of another deal.

It is clear that the evidence is sufficient to support the findings essential to sustain the judgment.

The judgment is affirmed.

Jefferson, Acting P. J., and Kingsley, J., concurred.

---

[4]The papers in the second transaction or escrow were not before the trial court.